Next case will be 08-1404-05-06, Procter & Gamble v. TEVA Pharmaceuticals. Mr. Galbraith, whenever you're ready. Thank you, Your Honor. May it please the Court, the District Court erred in finding that Resedronate would not have been obvious in view of the compound that we have called 2-pure EHDP in this case and that compound's known properties as described in the 406 patent. Now, the District Court basically held first that it went through the sort of analysis that this Court's jurisprudence has laid out recently in looking for a lead compound or considering whether the 2-pure EHDP was a lead compound and the District Court's only lead compound was that it was not specifically set out in a claim of the 406 patent by itself. And this reflects error on the part of the District Court. While it's clear, I think, in this Court's jurisprudence that a reference such as the 406 patent must be examined, someone of ordinary skill would examine it, for all that it discloses to the person of ordinary skill. And a review of this reference, as the undisputed evidence shows, is that this reference shows that of all the compounds in all the prior art references in all the world, the 2-pure EHDP was by far the best, most promising compound in the prior art. This reference discloses that 2-pure EHDP had a dose, effective dose, that was ten times less, smaller than any other bisphosphonates. Two different models that were the standard models for use in screening these compounds indicated that 2-pure EHDP would be by far, would possibly, probably be by far the most active compound in the prior art. Did the inventor, Benedict himself, treat this as a lead compound? It's not clear what the inventor did. The record is a little murky about the court did not find that he was able to corroborate his invention date. No, that's not what I'm talking about. I'm sorry. I'm talking about didn't the inventor himself focus on the 2-pure? He, it was the first, apparently the first compound that he made. And then he made the other two isomers, but he made the 2-pure first because he had a synthetic method to make it that didn't work for the other two isomers. And then later he discovered a synthetic method, or he found in the literature, a method that would work easily for all three. But he did make the 2-pure EHDP compound first. The P&G tells us that a key parameter is the ratio. My question is, having made the 2-pure compound, did Benedict himself treat that as an interesting compound, a lead compound that perhaps would be significant? Absolutely. That compound was tested right away and was shown to be very, very, very active. And then he proceeded to make the other two isomers. There's no question, I think, about the chronology that the 2-pure compound was made first and then, and tested, and then he made the other two. And definitely it was, it was, it was very active in the first test, the initial test done. P&G tells us that the ratio of the therapeutic dose, or the active dose rather, I'm sorry, the toxic dose to the therapeutic dose is a key parameter, a safety ratio, a therapeutic ratio. The Ferro-6 patent tells us, teaches one of ordinary skill in the art, that 2-pure EHDP had the best therapeutic ratio of any of the compounds disclosed in the patent. It was 10 times, potentially 10 times better than alendronate, which is now Fosamax, which is the largest selling bisphosphonate, and at the time was the leading candidate in clinical trials in the United States. And the Ferro-6 patent also shows that the 2-pure EHD compound did not exhibit the problem of mineralization, or inhibition of mineralization, which was a problem that had plagued this class of compounds and that people were trying to look for compounds that didn't show that effect and this one did not. So for all those reasons, the district court erred in simply focusing on what was claimed or how P&G had chosen to write the claims and ignored the entire specification of the patent. That was error. Had the district court done the correct analysis, I believe there would be no question that this would be a lead compound. Now, what about 4-pure? If 2-pure works, why not 4, and 4 doesn't work? So then, isn't there some evidence in the record that they said these are surprising results and the toxicity is different, and so it's not necessarily so obvious that this would work? First of all, 4-pure does work. It is approximately, according to their data, has approximately the same activity as a lendronate. It's not as good, so it does work. It's definitely a bone resorbing agent, or definitely inhibits bone resorption to the very successful drug. It wasn't as active as the two others. That's true. But the first question in prima facie, obviously, this is not unexpected results. It's whether somebody would be motivated to make the 3-pure having the activity of the 2-pure in front of them or her. And in this case, I think this is where the district court went awry. First of all, in simply overlooking or not discussing or not crediting anything that was in the patent specification, even though all of P&G's experts essentially agreed with everything I've said. And again, this enhancement of activity was also evidenced in Claim 15, which we've relied on for the double patenting defense. The Claim 15 lists the 2-pure EHDP as having a dose that is one-tenth the dose of any other compound in the claim, which indicated, and the P&G's expert confirmed, that that indicated that it was the most potent compound. The district court also erred in the next step of the analysis that it took, and that was whether there was a motivation to modify. Somebody skilled in the art who was presented with the 2-pure EHDP and its properties had been motivated to make the next step, and the district court relied on two little snippets from an article, and the snippets say, basically, that it's not completely predictable what's going to happen when you modify a compound. The district court's unstated assumption seems to be that a person skilled in the art confronted with that knowledge would simply give up, would simply go away and sit in a corner and not know what to do, and I think that kind of analysis is contrary to what this art is and what skill in the art is. These are very skilled people. Their job is to make new compounds. That's what the district court found. They have PhDs in synthetic chemistry, and they are specially trained in phosphorous chemistry, so they are not the people who are, they are the people that KSR tells us have ordinary creativity. That's what ordinary skill in the art is, and what the court overlooked in dealing with this motivation issue was the undisputed fact that these compounds are active as a class. Almost all of them are active to some degree. This phosphonates for inhibiting bone resorption. The inventor himself said he, based on knowledge of the art, he expected, he would have expected that resedronate would have been active. Resedronate is the structurally closest compound to pure EHDP. The court found, based on the testimony of one of P&G's experts, that a person skilled in the art would have expected resedronate to be active at the time. Resedronate had the same, well, the two of the structural features of 2-pure EHDP that were known to contribute to activity. One was the hydroxy bisphosphonate portion, which was sort of the, recognized as the optimized part of the molecule for what we call the head of the molecule. It also had, like 2-pure EHDP, it had a nitrogen atom in the tail that was known to enhance activity and to ameliorate this problem of bone mineralization through inhibition of mineralization. The change from 2-pure EHDP to 3-pure EHDP or resedronate is the easiest synthetic change to make. They are made by the same process, simply they are made, the only difference is they are used different isomers of the same starting material. It's an easy process to do, the inventor said, basically it was put in a pot and forget it and it works the same for both compounds. The common practice among people skilled in the art when they made these type of purine isomers was to make all three because people skilled in the art were motivated to do that, that's their job. It was pointed out, the record shows that there are eight examples contemporaneous with this invention of commercial drugs where the inventors did that. So for all these reasons, it would suggest that a person skilled in the art would have been motivated to make this compound, would have had a reasonable belief, a belief based on reason that the compound would be active. The fact that it's not precisely predictable what its properties are going to be is not something that's relevant to whether somebody would have had this motivation or would have had this expectation. The expectation that the case law requires is an expectation that's sufficient to motivate somebody to take the next step. It's pretty clear from everything everybody said that the expectation would have been that Resedronate would have been active and that's enough to establish prima facie obviousness. Now, the court went on to say that even if the compound were prima facie obvious, that the P&G showed sufficient unexpected results. The case law doesn't define in quantitative terms what is sufficient as an unexpected result to overcome a case of prima facie obviousness. But the case law, the theme of it is that the unexpected results must be something that would at least appear to be likely to be significant in the real world. The next step on a continuum is not sufficient to overcome prima facie obviousness. Other cases say that unexpected results may, in some cases, not be sufficient to overcome obviousness at all, no matter how unexpected they are. That is certainly true. We held that in Richards and Vicks. We held that in Fines. In Richards and Vicks, the unexpected enhancement of pain relief, I guess it was, was statistically significantly, was actually statistically significant in that case and this court held that that wasn't sufficient in view of the obviousness of the compound. I think the reason that the case law talks in terms of truly unexpected or differences in kind rather than degree is a reflection of what we're doing when we say that a compound is patentable because it has unexpected results. We don't even get to the unexpected results issue unless and until the compound has already been determined to be prima facie obvious. It's prima facie presumptively belongs to the public, belongs to nobody, it's available to nobody in particular. Nobody can get a patent on it. If we're going to say that unexpected results can give somebody a patent, then we are saying that the unexpected results take away what the public presumptively has and gives it to an individual for, in this case, a 17-year period. It seems to me, at least, that the court should not do that or should not permit that unless these unexpected results are truly significant in the real world or at least appear to be likely to be truly significant in the real world. Is that the appellate court then just setting a different standard or is that a district court function? Well, I think it's certainly a different standard. It's I think a rationale for having a reasonably rigorous standard for unexpected results because of what it means. Is this a sufficiency of the evidence issue? I think the court should find as a fact that the unexpected results have a degree of significance. So that would be a district court function, I guess, as a finding of fact. The only findings that the court made here, first of all, P&G relies not on therapeutic tests or not on rigorous tests. They rely on screening data designed to weed out all the chaff from compounds that are ... Why don't you just state what it was they found your time has totally expired, including your rebuttal. You want to finish the answer and then we'll ... Okay. The court's finding of unexpected results, there are two findings the court makes, neither of which is supported by the record. What are they? Quickly. The two findings, the first one was that the resendronate gave an activity three times the level of 2-period HDPE at a certain dosage range, dosage strength. That's not true. There's no data to support that. What's the other one? The second one was that the resendronate had a toxicity profile three times better than that of 2-period HDPE. There's no evidence of that. Nobody used that. Okay. Thank you. Mr. Lee? We'll return to this rebuttal time, so if you need a little time yourself after time. Thank you, Your Honor. Thank you. May it please the court. My name is Bill Lee and together with my partner, David Bassett, I represent the appellee, Procter and Gamble. Time permitting, I'd like to make four points. The first is all of the findings that Mr. Galbraith has just discussed with you are fundamentally, at their core, factual findings. No, wait a moment. As to the lead compound question, that's not fundamentally a fact question. Your Honor, it is fundamentally. I'm sorry. I'm having great difficulty after looking at the 406 patent, why the 2-peer isn't a lead compound. It seems to have been treated that way by the inventor, Mr. Bennett, Dr. Bennett. I actually can give you three reasons why not, Your Honor, going directly to the 406 patent. The first is if the court considers what is set forth in the background of the invention of the 406 patent in column one at A622. What the 406 patent says is all bisphosphonate, all polyphosphonate compounds have a problem. It's not just what Mr. Galbraith focused on. The two patents together collectively say there are three things that the scientists need to consider in deciding whether there is a safe and efficacious compound. It is potency for sure, but it also includes- And the 406 shows that the 2-peer is a potent compound. It's potent, Your Honor, and I'll get to the second part, but it's potency, toxicity, and anti-mineralization. In fact, if Your Honor, if the court considers what's at column one- It has better results than any of the other compounds in terms of mineralization inhibition, right? Actually, no. If Your Honor considers A628, which is table three of the 406 patent, and Your Honor, if I could just give you the three points. The first is what is said in the background of the invention is you need to consider all of these. If you're looking for a cure for cancer, cyanide is very potent at killing cells, and unfortunately kills all of your cells. This is saying we need to find a way to have something that's potent, but also safe, non-toxic, and prevent anti-mineralization. The toxicity level is 1,000 times the lowest effective dose. Your Honor, this is why it's so ... This is why I think- Is my statement incorrect? It is 1,000 times what many years later, after phase one, phase two, phase three's ended up being. In the 406 patent? Yes, but Your Honor, the dose, the one milligram dose, was the dose at which titranate and clodranate, two of the bisphosphonates which were being successfully tested, were administered at one milligram doses. If you go to table three, which is the second part of the 406 patent, what Your Honor will see there is two things. If you consider toxicity and you consider anti-mineralization, in fact what you find is all four of the nitrogen-containing compounds in table three, all four, including 2-Pyr, have toxicity problems. Several of them have anti-mineralization problems. In fact, Your Honor, if you look at table three- I'm not understanding why the 406 doesn't show the 2-Pyr to be the most promising compound. In fact, Benedict himself viewed it as a promising compound, right? He viewed it as a promising compound, but to answer your question to Mr. Galbraith, Dr. Benedict began working with polyphosphonates in 1983. He made 2-Pyr in early 1983. He didn't make 3-Pyr until several months later. He made hundreds of compounds during this period of time, and this is why, Your Honor, it is a factual question that should be subject to the clear error standard. The district court judge got to hear about all of the compounds he was making. He got to see a document precisely at this point in time when Dr. Benedict wrote contemporaneously, you have to kiss a lot of frogs to get a prince, meaning that you just don't know. And I think, Your Honor- Let's assume that the 2-Pyr is a lead compound. Didn't Benedict testify that he'd be motivated to investigate these other compounds, including the 3-Pyr? Didn't he say that he'd be motivated to investigate the same family? And on 1426, it turns out that there are only five other compounds in the family, right? Your Honor, the answer is yes to both of your questions. This is ring walking, which is a concept which was discussed in the Takeda case. He did say you would have an incentive to consider the other compounds in the family. He also said you would have no idea what you would get. And if I could go back to this point, Your Honor, it is Teva has characterized the test as whether the drug is potent or not. It is true that 2-Pyr EHDP was more potent than the other products tested and for which data was provided in the 406 patent. But the 406 patent on its face says that potency is not the test alone. You have to consider toxicity and you have to consider anti-mineralization. And this is where the factual finding becomes key because at trial, Your Honor- But doesn't the 406 show that the 2-Pyr does well on the mineralization point? No, not compared to clodronate or retigernate. If you look at Table 3, in fact, the only compounds in Table 3 that have no toxicity problems and no anti-mineralization problems are non-nitrogen containing compounds. So, and this is what, if I could go back to the trial, there were several scientists who worked with bisphosphonates in 1985, lay witnesses. There were three scientists who worked with bisphosphonates who are expert witnesses who helped explain precisely this data and why the anti-mineralization data and toxicity were important. Those scientists testified that to one of ordinary skill in the art in 1985, the 406 patent would not have led you to 2-Pyr. In fact, there were other considerations in the patent that would have led you elsewhere. Which are what? Toxicity, Your Honor. But toxicity a thousand times the lowest effective dose. Your Honor, that's a thousand times the lowest effective dose in these tests in vivo and in vitro. But it's at a test, two points, it's at the same level that retigernate and clodronate, the two products in Table 3 which are most efficacious for anti-mineralization purposes were tested at. And secondly, Your Honor, if you look at the chart, if you compare 2-Pyr and 3-Pyr, at that dose, 2-Pyr killed all the rats. 3-Pyr had 200% beneficial effect. I'm not understanding. 3-Pyr is not in the 406. The question is, would you select the 2-Pyr as the compound? And in terms of the toxicity, if you have toxicity a thousand times the lowest beneficial dose, that's not something that people would normally be concerned about, right? Your Honor, actually, I respectfully disagree. And I think Your Honor will find that the proof at trial from the scientists who were there said differently. They didn't know in 1980, there was not a bisphosphonate on the market in 1985. No one knew what the therapeutic dose was going to be. No one knew what you were going to be able to give to have a beneficial effect on osteoporosis. That's why there was a long-felt need. But that's why I have to go with the data that's in the 406. The data about toxicity in the 406 is not something that would be of concern to somebody, is it? The answer is yes. And in fact, Your Honor, that's what every witness who was involved in the field testified. Ms. McOsker, who performed the test, testified that you would be concerned. Dr. Miller, who was working in the field at the time, tested bisphosphonates, was an expert in the Schenck and TPXT tests, said you would be concerned. This would be a concern for you. Your Honor, if you step back and ask yourself, if it wouldn't be a concern, why is it that the authors of the 406 patent make it clear that there are toxicity problems in Table 3? And this is why I think the question I started with, Your Honor, on whether this is a factual question or not, in which there is some deference owed to the district court and whether it should be determined by clear error, is critical. Because in this case, there was one witness on the other side who testified as to the issues Your Honor is asking about and what the facts and meaning were. It is someone who had never worked with bisphosphonates. It is someone who had never heard of the test before. It is someone who had never heard of residronate. It is someone who had never heard of 2PIR. It is someone who was given residronate when he was hired for the case, given the 406 patent, and he went to the library to construct a theory. Now, the district court was entitled to hear that testimony, and at page 849, he said, I find it non-persuasive. And he then said, the testimony of the people who were there, and we called a clinician who was involved in the field, we called a chemist who was involved in the field, and we called a testing expert, a pharmacologist, who had experience with the precise tests Your Honor is asking about. And the question of what the 406 patent discloses, the question of how it should be interpreted, is a factual question. Otherwise, it would just be you or I or any other member of the court reading the patent. The reason that people are put on the stand and qualified to testify about what it means is so that they can provide a reasoned explanation for the meaning, and it can be tested in the crucible of cross-examination. That's, in fact, what occurred. And in order to, and I'll come to the unexpected results question that Your Honor raised, but the district court found as a matter of fact that one of ordinary skill in the art would not have selected two pairs of lead compound. He also found as a matter of fact... But didn't Benedict himself indicate that it was a compound of particular interest? He said it was a compound of interest when he made it. From all of the other compounds he was working with, which he described as hundreds, that was a testimony, Your Honor. He didn't single this one out. This is the man who made two pair. He's testifying that there are, as he said, you have to kiss a lot of frogs to get a prince. He was kissing a lot of frogs, and he described them, and he put his notebooks into evidence. But if you didn't credit him, you have to also weigh into the fact you had Dr. Belzikian, Dr. Miller, Dr. McKenna, all of whom worked in the field, all of whom looked at the 406, which is what you have to look at because it's not just what Dr. Benedict thought because he's presumed to be someone of extraordinary skill in the field as the inventor, not necessarily just one of ordinary skill. So as a legal matter, what he thought actually isn't technically relevant to the $64,000 question. The question is what about the person of ordinary skill in the art, and all of the people who were there at the time said you would not have looked at this as a factual matter and selected this as the leading compound. And, Your Honor, the third point I was going to make way at the beginning was if you look at claims, if I can get them right, if you look at the specific claims, claims 16, 18, and 19, the 406 patent, where they actually decide to specifically identify the best compounds with their dosing regime, which ones do they identify? They identify the two from table three that have no anti-mineralization problems and no toxicity problems. They don't identify two pure EHDP. That's why the experts testified without any equivocation that one of ordinary skill in the art looking at the 406 would recognize these four critical facts. It's a dosing regime designed to deal with multiple problems. The multiple problems are toxicity, potency, anti-mineralization. There are specific data on all three issues. And while they identify groups of compounds like Takeda, you cannot pick out one. And the specific claims that ultimately call out just one are very instructive. But all of that has to be supported, in our view, by substantive evidence from people who were in the field at the time answering the questions that Your Honor asked. And they were answered at trial, and the district court so found. In order to reverse the judgment, this court would have to find that the district court was incorrect on lead compound, incorrect on motivation to combine, incorrect on reasonable expectation of success, and you'd have to reach the decision of whether the unexpected results, which were truly unexpected, were sufficient to overcome a prior decision. We'd have to remand, wouldn't we, if we found that this was a lead compound? Pardon? We'd at least have to remand if we concluded that he was wrong about two pure not being a lead compound. May I answer the question, Your Honor? You have another few minutes before giving him his rebuttal back. Okay. I apologize. I think that's not correct, Your Honor, because even if you found it to be a lead compound, his opinion is written in a if no lead compound, buff it. But if it is, no reason to combine. But if it is, no reasonable expectation of success. I think it's important to go to that point because you have to reach each of them and you have to flip him on each of those. His only basis on the motivation was the toxicity, right? No. They're taught away because of the toxicity. No, Your Honor. In fact, if you go to his opinion, you will find multiple references. Oh, not just potency. Yes, toxicity. Yeah, that's right. You'd have to, in order to reverse and remand, you would have to find, even setting aside the unexpected results issue you raised, Mr. Galbraith, you would have to find clear error on lead compound. You would have to find, actually, you have to find clear error on level of skill in the art, lead compound, reason to modify, expectation of success. And the expectation of success was critical here because there was a god in the field at the time, Herbert Fleisch, who wrote contemporaneously with the events going on here, who said in black and white, you just can't predict. Now, to go to Judge Huff's question about unexpected. But you don't have to predict. Under Pfizer and other cases, we've said specifically, the unexpected results can't overcome a strong prima facie case of obviousness, right? Actually, there are two separate issues here, Your Honor. The first is a question of reasonable expectation of success, which is part of their burden to prove invalidity. And that still exists after KSR because of the Supreme Court's specific reference to predictable results. And Takeda and ASI continue to apply that. In Pfizer, on that issue, Pfizer had told the FDA that there was no difference in the results that was anything other than predictable. That's different. If you get to unexpected results, which can overcome a prima facie obviousness case, again. It can. It doesn't have to, right? It's a secondary consideration under Graham. All of which are fundamentally, all of which were found by the judge to exist. And if I could use my last minute to address the unexpected results and to answer Judge Huff's question about four-pair, this is, I think, critical in why the factual findings are so key. These structures are not two-dimensional structures. They're complicated three-dimensional structures that exist in space. The evidence at trial was that in 2003, people working with two-pair, three-pair, four-pair, discovered just why three-pair worked and the others didn't. And it's because the location of the nitrogen on the three-pair in three-dimensional space allowed it to bind and function to address osteoporosis and bone resorption in a way that cannot occur with two-pair and four-pair because they are physically in a different location in three-dimensional space. So what the district court judge saw was these three things. He had test results that showed three-pair to be three times more close. This is very interesting. It is in the books. We have read it. I apologize.  Thank you, Your Honor. Mr. Gilbreath. Thank you, Your Honor. I appreciate the court's indulgence. Just to correct a couple of things, the 406 patent does say, does teach, that two-pair EHDP does not have a mineralization problem. It's in Table 3. Dr. Miller, their expert, affirmed that fact. It's in A323. In his testimony, he says, that table shows there was no mineralization issue with two-pair EHDP. The toxicity issue was something that was sort of made up for this trial. At the time, Dr. Benedict thought that two-pair EHDP would be a fine drug. P&G characterized the difference between those two toxicities, two-pair EHDP and the toxicity of Resedronate. Testify those numbers, I mean, sorry, characterize those numbers as similar, as reflecting similar toxicities. The 406 patent lists two-pair EHDP, not as a toxic compound, but as a preferred compound. The 122 patent, patent in suit, claims two-pair EHDP and lists it as a preferred compound and shows a clinical trial or clinical data with two-pair EHDP and says it gives similar results to Resedronate. We do have findings of the district court, but we can't assume that the district court made all the findings that P&G would like it to have made. All we have is what the district court said. The only thing the district court said about the reason it was the lead compound was the way it was claimed in the patent. The only thing the district court said about why there was no motivation to make the next isomer was the teachings of Dr. Fletch. That's all the district court said. It did not make all these subsidiary findings that Mr. Leese would have liked it to have made. So all we can say is whether the findings that the district court made are erroneous or not erroneous or whether they are legally sufficient or not sufficient. Thank you, Your Honor. That's basically all I have. Thank you very much. The case is submitted. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.